[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15172
Non-Argument Calendar
_____

D.C. Docket No. 6:10-cv-01714-ACC-GJK

CHERIS HUBBARD,

Plaintiff-Appellant,

versus

MERITAGE HOMES OF FLORIDA, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 30, 2013)

Before CARNES, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Plaintiff Cheris Hubbard appeals the district court's grant of summary judgment in favor of her former employer, Meritage Homes of Florida, Inc. ("Meritage"), on her pregnancy discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2(a) and 2000e(k), and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.10.  After review, we affirm.

## I.  STANDARD OF REVIEW

At the outset, Defendant Meritage points out that Plaintiff Hubbard did not file any opposition to Meritage's summary judgment motion in the district court. Defendant Meritage argues that Plaintiff Hubbard thus forfeited appellate review of the district court's entry of summary judgment on her pregnancy discrimination claims.

That argument fails because when a summary judgment motion is unopposed, the district court must still review the materials submitted in support of the motion and determine whether they establish the absence of a genuine issue of material fact.  See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004); see also Fed. R. Civ. P. 56(e)(3) (stating that when a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered

2

undisputed—show that the movant is entitled to it"). Accordingly, we review <u>de novo</u> the district court's grant of summary judgment on Plaintiff Hubbard's pregnancy discrimination claims, applying the same legal standards as the district court and viewing the evidence in the light most favorable to the non-moving party. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]

## II.  HUBBARD'S EMPLOYMENT

### A.    Hubbard's Sales Associate Job

Defendant Meritage is a builder of planned residential communities. In late October 2008, Plaintiff Hubbard began working for Defendant Meritage as a sales associate at one of its communities, The Oaks at Brandy Lake. In June 2009, Hubbard told Brian Kittle, her direct supervisor, that she might be pregnant. Soon after, Hubbard learned she was not pregnant, but she told Kittle she intended to start a family.

The next day, Kittle transferred Hubbard to the Live Oak Reserve community, Defendant Meritage's most desirable and bestselling community.

---

[1]In her brief on appeal, Hubbard does not challenge the district court's grant of summary judgment on her claims of sex and gender discrimination and retaliation and thus she has abandoned these claims. <u>See</u> <u>United States v. Jernigan</u>, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). We consider only Hubbard's pregnancy discrimination claims.

Hubbard took the place of another sales associate, Thomas Temmel, who was transferred to Lake Roberts.

Kittle testified that he transferred Hubbard because she said she was starting a family, and he wanted to give her a good start by selling lots in Live Oak. In his deposition, Kittle explained, however, that because Live Oak was a high-demand community in an otherwise bad economy, Meritage planned to cycle sales associates in and out of Live Oak to give different employees the opportunity to earn commissions.

Later that summer, Hubbard did in fact become pregnant. Hubbard informed Kittle of her pregnancy on August 25, 2009. The next day, Hubbard was transferred from Live Oak to Indian Lakes, a much slower selling community, trading places with another sales associate, Candace Roberts. Kittle declined Hubbard's requests to be transferred back to Live Oak. Kittle repeatedly questioned Hubbard about whether she planned to take maternity leave or was going to "take the [commission] money and quit."

## B.    Hubbard's Termination

In December 2009, Defendant Meritage terminated Hubbard's employment for insubordination relating to Hubbard's handling of a particular sales contract. The decisionmakers were James Bagley, Meritage's president, and Doug Bainbridge, Meritage's regional vice president of human resources.

4

Specifically, on November 30, 2009, Meritage discovered that some of their buyers' sales contracts at Live Oak violated the homeowner's association "monotony rules" prohibiting the same floor plans or elevations on adjacent lots. Three Meritage employees—Plaintiff Hubbard, Thomas Temmel and Candace Roberts—had sales contracts that were affected. Meritage advised all three sales associates of the problem.

Employees Temmel and Roberts both testified that they were told to call their buyers immediately to advise the buyers that they could either change their floor plan or cancel their contract and get a refund. Both Temmel and Roberts called their buyers, and each sent an email to Kittle on December 1 advising that they had resolved the problem with their buyers.

Brian Kittle testified that President Jim Bagley gave instructions to all three employees at the same time in a face-to-face meeting. Candace Roberts confirmed that President Bagley gave her instructions at a division meeting. Hubbard, however, testified that President Bagley contacted her separately by phone. For summary judgment purposes, we accept Hubbard's version. [2]

_____

[2]Defendant Meritage vigorously disputes Hubbard's version of events. President Bagley averred that he clearly told Hubbard, as he had Temmel and Roberts, that she needed to call her buyer immediately and offer him the option of either picking a new floor plan or cancelling his contract. Kittle testified that when Hubbard came to him for help, he told her to do what Bagley had instructed her to do. In reviewing summary judgment, however, we accept Hubbard's version of the facts as true, even though the "true facts may prove to be otherwise." See Mangieri v. DCH Healthcare Auth., 304 F.3d 1072, 1073 n.2 (11th Cir. 2002).

According to Hubbard, she did not get such explicit instructions. When President Bagley called Hubbard, he told her that one of her sales contracts violated the monotony rules and stated, "We may need to cancel [the contract]." Hubbard found Bagley's instructions "vague," and "didn't know exactly how to approach the buyer with it and what the options were." After the call, Hubbard called Kittle to ask him "for assistance on calling the buyer to go over some options." According to Hubbard, Kittle told her not to contact her buyer until after management discussed the situation the next morning.

The next day, December 1, Hubbard did not contact her buyer, Minish Patel. On December 2, Patel had an appointment with a design consultant at Meritage's design center to select finishes for his home. That morning, Hubbard told the design consultant to cancel Patel's appointment. Patel arrived at the design center anyway and learned of the problem with his contract.

Meritage's Vice President of Sales, Jack Johanessmeyer, went to the design center to try to salvage the sale to Patel. Johanessmeyer then called President Bagley and advised him of the situation. Bagley believed that Hubbard had tried to circumvent his instructions by going to Kittle for an alternate solution. Bagley contacted Hubbard and told her that her failure to notify Patel "had placed Meritage in a difficult situation and that she had circumvented a directive that [Bagley] personally gave her."

6

That evening, President Bagley reviewed the situation with Bainbridge, the Vice President of Human Resources, and recommended that Hubbard be terminated. Bainbridge agreed that Hubbard had engaged in serious misconduct. Bainbridge stated that Hubbard's failure to contact Patel and advise him of the problem with the sales contract and her failure to advise Patel not to come to the design center for his appointment constituted insubordination. Bainbridge further stated that Hubbard's not following Bagley's directions and her attempts to circumvent them by contacting a subordinate employee (Kittle) to get a different opinion "had [a] serious impact upon Meritage, including potential loss of a sizeable home sale, negative impact on Meritage's reputation and loss of credibility and trust with Meritage's customers." Accordingly, Bainbridge approved Bagley's recommendation to terminate Hubbard. Hubbard was advised of her termination the next day.

## III.  PREGNANCY DISCRIMINATION — GENERAL PRINCIPLES

Title VII and the FCRA prohibit certain employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); Fla. Stat. § 760.10(1)(a). The phrase "because of sex" or "on the

basis of sex" in Title VII includes "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).[3]

Under Title VII, a plaintiff bears "the ultimate burden of proving discriminatory treatment by a preponderance of the evidence," whether that evidence is direct or circumstantial.  Crawford v. Carroll, 529 F.3d 961, 975-76 (11th Cir. 2008) (quotation marks omitted).  Where, as here, the plaintiff seeks to prove pregnancy discrimination through circumstantial evidence, the claim may be evaluated under the burden-shifting framework established in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1314 (11th Cir. 1994).  Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. [4]

A plaintiff may establish a prima facie case of pregnancy discrimination by showing that: (1) she is a member of a group protected by Title VII; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4)

---

[3]It is an open question whether the FCRA, like Title VII, recognizes claims of pregnancy discrimination.  See DuChateau v. Camp, Dresser & McKee, Inc., ___ F.3d ___, No. 12-10838, 2013 WL 1405166, at *3 (11th Cir. Apr. 9, 2013).  Assuming, however, that the FCRA provides for a pregnancy discrimination claim, "it would be construed in the same manner as a cause of action for pregnancy discrimination under Title VII."  See id.  Thus, the district court's grant of summary judgment as to any FCRA pregnancy discrimination claim was proper for the reasons discussed above with respect to Hubbard's Title VII pregnancy discrimination claim.

[4]As an alternative basis for summary judgment, the district court concluded that Hubbard failed to show that Meritage's legitimate, nondiscriminatory reason for terminating her employment was pretext for pregnancy discrimination.  Because we affirm the district court's first ground for summary judgment, we do not reach the district court's alternative ground.

she "suffered from a differential application of work or disciplinary rules."  Spivey v. Beverly Enters., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999).  Generally, when the plaintiff alleges discriminatory discipline, the plaintiff must show that the employer treated similarly situated employees not of the protected class more favorably.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  To make this showing, the plaintiff and her comparators must have engaged in the same or nearly identical misconduct.  Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006).

However, a plaintiff alleging pregnancy discrimination "need not identify specific non-pregnant individuals treated differently from her, if the employer violated its own policy in terminating her."  Armindo v. Padlocker, Inc., 209 F.3d 1319, 1321 (11th Cir. 2000) (noting that the plaintiff fired for poor attendance during her probationary period did not present evidence that her employer violated company policy regarding sick leave).  In addition, if the plaintiff cannot show a non-pregnant comparator who was treated differently, she alternatively can survive summary judgment by presenting circumstantial evidence "that creates a triable issue concerning the employer's discriminatory intent."  See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. Cir. 2012) (explaining that the plaintiff does not have to show a non-pregnant comparator who was treated

9

differently "if she can show enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination"). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith, 644 F.3d at 1328 (footnote and quotation marks omitted).

## IV.  HUBBARD'S PREGNANCY DISCRIMINATION CLAIMS

On appeal, the parties do not dispute that Plaintiff Hubbard met the first three prongs of her prima facia case—that is, as a pregnant woman, Hubbard was a member of a protected group, she was qualified for her sales associate job at Defendant Meritage, and she suffered an adverse employment action when she was terminated.  The parties disagree, however, as to whether Hubbard satisfied the fourth prong—that she was treated differently than other non-pregnant employees.

Hubbard contends that she presented evidence of two other sales associates, Candace Roberts and Thomas Temmel, who were not pregnant and were treated more favorably.  However, it is undisputed that neither of these sales associates engaged in the misconduct for which Hubbard was terminated.  After receiving instructions, both Roberts and Temmel understood what they needed to do and promptly called their buyers and informed them of the problems with their sales

contracts. Both had resolved the problem with their buyers and had notified their supervisor of this fact by December 1.

In contrast, it is undisputed that Hubbard did not call her buyer, Patel. Patel then showed up at the design center on December 2, where he learned of the problem for the first time and one of Meritage's vice presidents had to intervene to try to save the sale. In other words, neither Roberts nor Temmel was similarly situated to Hubbard and thus is not a sufficient comparator. Therefore, Hubbard cannot make out the fourth prong of a prima facie case of pregnancy discrimination using the McDonnell Douglas approach.

Hubbard argues that she presented other evidence that she was treated differently after announcing she was "pregnant or potentially pregnant" but before she was terminated, which constituted circumstantial evidence that her pregnancy played a significant role in her termination. For example, Hubbard claims that she, unlike Candace Roberts, was not told her assignment at Live Oak was temporary. However, the record shows that neither Hubbard nor Roberts was told anything about the duration of their assignments at Live Oak. Indeed, Roberts testified that it was the nature of the home sales business to be moved as new communities and new selling opportunities opened up.

Hubbard also did not present any evidence that non-pregnant employees were moved around less frequently than Hubbard was. To the contrary, Temmel

11

was transferred from Live Oak after only a few weeks, and Roberts stayed for only three months before being transferred to another Meritage community and being replaced at Live Oak by another sales associate.

Hubbard contends that Temmel, but not Hubbard, was allowed to sell in more than one community in violation of company policy. However, the record does not support this proposition. Rather, both Temmel and Hubbard were allowed to continue pursuing leads for Live Oak after they had been transferred. In fact, Hubbard was still working on the Patel sales contract in Live Oak in November 2009, long after she was transferred to Indian Lakes in late August.

Hubbard also points to the higher quota she was required to meet to win a Las Vegas trip. However, it is undisputed that, at the time, Hubbard was assigned to Meritage's highest selling community. Both Kittle and Roberts testified that quotas were set based on the particular community the sales associate was assigned to. Specifically, the baseline of two sales per month was adjusted based on the sales volume of the community. Hubbard presented no evidence that Meritage unequally applied this method of establishing the sales quotas.

Finally, Hubbard notes that although Bagley gave her some instructions, they were not the same clear instructions given to Roberts and Temmel about how to handle the problem with Patel's sales contract. While this fact must be accepted as true, it does not present "a convincing mosaic of circumstantial evidence that

12

would allow a jury to infer" that Meritage engaged in intentional pregnancy discrimination.  See Smith, 644 F.3d at 1328 (quotation marks omitted).

For all these reasons, the district court properly granted summary judgment on Hubbard's pregnancy discrimination claims.

**AFFIRMED.**